O

JS - 6

cc: order, docket, remand letter to
Los Angeles Superior Court, No. BC 486338

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL TRANG, Individually, and On Behalf of Other Members of the Public Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TURBINE ENGINE COMPONENTS TECHNOLOGIES CORPORATION and DOES 1-10, Inclusive,<br><br>Defendants.<br>_____ | Case No. CV 12-07658 DDP (RZx)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION TO REMAND AND VACATING EX PARTE APPLICATION**<br><br>[Dkt. Nos. 15 & 22] |

Presently before the court is Plaintiff Michael Trang's Motion to Remand to Superior Court of California, County of Los Angeles. Having considered the submissions of the parties and heard oral argument, the court grants the motion and adopts the following order.

**I. Background**

Plaintiff worked as an hourly, non-exempt machinist for Turbine Engine Components Technologies ("TECT") until February 2012. (First Amended Complaint ("FAC") ¶ 23.) TECT is a parts

1  manufacturer. (Id. ¶ 2.) On August 8, 2012, Plaintiff, on behalf of

2  himself and all others similarly situated, filed a class action

3  lawsuit in Los Angeles County Superior Court against TECT. The

4  putative class consists of:

5       Any and all persons who are or were employed as an hourly,
        non-exempt employee, however titled, by TECT in the state of
6       California within four years prior to the filing of the
        original complaint in this action until resolution of this
7       lawsuit.

8  (Id. ¶ 16.)

9       The FAC alleges fourteen causes of action for violations of

10 the California Labor Code and the California Business and

11 Professions Code, including failure to pay overtime wages and wages

12 upon termination, failure to provide meal periods or rest breaks,

13 and unfair competition. Among those fourteen causes of action are

14 seven under the Private Attorney General Act of 2004 ("PAGA").

15      On September 6, 2012, Defendant timely removed the suit to

16 federal court under the Class Action Fairness Act of 2005 ("CAFA").

17 Plaintiff now brings this motion to remand, arguing that TECT has

18 failed to prove by a preponderance of the evidence that the amount

19 in controversy exceeds the five million dollar jurisdictional

20 minimum for class actions based on diversity jurisdiction.

21 **II.  Legal Standard**

22      A defendant may remove a case from state court to federal

23 court if the case could have originally been filed in federal

24 court.  28 U.S.C. § 1441(a); see also Snow v. Ford Motor Co., 561

25 F.2d 787, 789 (9th Cir. 1977). CAFA, passed in 2005, amended the

26 conditions under which class actions can be brought to federal

27 court based on diversity jurisdiction. Under 28 U.S.C. § 1332(d), a

28 class action can be brought in federal court if: (1) at least one

1   defendant and one plaintiff are from different states; (2) there
2   are at least 100 class members; and (3) the amount in controversy
3   exceeds $5,000,000. "CAFA was enacted, in part, to restore the
4   intent of the framers of the United States Constitution by
5   providing for Federal court consideration of interstate cases of
6   national importance under diversity jurisdiction." Roth v. Comerica
7   Bank, 799 F. Supp. 2d 1107, 1115 (C.D. Cal. 2010)(internal
8   quotations and citations omitted).

9       The removal statute is strictly construed against removal
10  jurisdiction, and "[f]ederal jurisdiction must be rejected if there
11  is any doubt as to the right of removal." Gaus v. Miles, Inc., 980
12  F.2d 564, 566 (9th Cir. 1992). The removing party bears the burden
13  of proving federal jurisdiction.  Matheson v. Progressive Specialty
14  Ins. Co., 319 F.3d 1089, 1090 (9th Cir. 2003). This "strong
15  presumption against removal" does not change under CAFA. Roth, 779
16  F. Supp. at 1115 (internal quotations omitted); Abrego Abrego v.
17  The Dow Chemical Company Co., 443 F.3d 676, 685 (9th Cir. 2006).

18      When a plaintiff does not specify an amount of damages in the
19  complaint, "the removing defendant bears the burden of
20  establishing, by a preponderance of the evidence, that the amount
21  in controversy exceeds" the required amount. Sanchez v. Monumental
22  Life Ins. Co., 102 F.3d 398, 404 (9th Cir. 1996). In other words,
23  Defendant must "provide evidence establishing that it is 'more
24  likely than not' that the amount in controversy exceeds that
25  amount." Id.; see also Gaus, 980 F.2d at 566-67 ("If it is unclear
26  what amount of damages the plaintiff has sought . . . then the
27  defendant bears the burden of actually proving the facts to support
28  jurisdiction, including the jurisdictional amount.").

                                    3

1    "[R]emoval cannot be based simply upon conclusory

2  allegations." <u>Singer v. State Farm Mut. Auto. Ins. Co.</u>, 116 F.3d

3  373, 377 (9th Cir. 1997)(internal quotation marks and citation

4  omitted).  The court may require parties to submit "summary-

5  judgment-type evidence relevant to the amount in controversy at the

6  time of removal." <u>Id</u>. See also <u>Matheson</u>, 319 F.3d at 1090; <u>Valdez</u>

7  <u>v. Allstate Ins. Co.</u>, 372 F.3d 1115, 1117 (9th Cir. 2004).

8  **III. Discussion**

9      The court finds, and the parties do not dispute, that the

10  first two elements of diversity jurisdiction under CAFA are met.

11  First, Plaintiff alleges in his FAC that the putative class is

12  "estimated to be greater than one hundred." (FAC ¶ 17.) Second,

13  minimal diversity exists because Plaintiff Trang is a citizen of

14  California, and TECT is incorporated in Delaware and has its

15  principle place of business in Georgia or Kentucky. (Opp'n at 3:13-

16  16.) The only disputed issue is whether TECT has met its burden of

17  proof that the amount in controversy exceeds $5,000,000.

18      A.  <u>Amount in Controversy</u>

19      Plaintiff's FAC does not specify the amount of damages. Thus,

20  TECT has the burden of proving that it is more likely than not that

21  damages exceed $5,000,000. TECT provided a declaration from Martha

22  Kinsley ("Kinsley"), TECT's Human Resources Manager, in which she

23  calculated the number of putative class members and the amount in

24  controversy based on her "personal knowledge and [her] review and

25  analysis of TECT's payroll and personnel records." (Kinsley Decl. ¶

26  3.) Kinsley determined that the total amount in controversy reaches

27  $14,282,563.34 excluding attorney's fees. (Kinsley Decl. ¶ 45.)

28

1    To arrive at this figure, TECT assumed a 100% violation rate.
2 That is, Kinsley assumed that every putative class member suffered
3 a violation of every cause of action applicable to them during
4 every pay period.

5    Some courts have been willing to assume a 100% violation rate
6 to calculate the amount in controversy. See e.g., Coleman v. Estes
7 Express Lines, Inc., 730 F. Supp. 2d 1141, 1149 (C.D. Cal. 2010);
8 Korn v. Polo Ralph Lauren Corp., 536 F. Supp. 2d 1199, 1205 (E.D.
9 Cal. 2008). The logic behind such an assumption is that the
10 plaintiff is the "master of the complaint," and thus the plaintiff
11 could allege less than a 100% violation rate if he so chooses.
12 Roth, 799 F. Supp. 2d at 1128-29.

13    The court agrees that a plaintiff is the master of his
14 complaint, but finds that assuming a 100% violation rate may
15 undermine CAFA's intent to place the burden on the removing party.
16 "[U]nder CAFA the burden of establishing removal jurisdiction
17 remains, as before, on the proponent of federal jurisdiction."
18 Abrego Abrego, 443 F.3d at 685.  Assuming a 100% violation rate
19 would "improperly shift the burden to [the] plaintiff to refute
20 speculative assertions of jurisdiction and establish that there is
21 no jurisdiction." Roth, 799 F. Supp. 2d at 1129; see Abrego
22 Abrego, 443 F.3d at 685.  Moreover, "crediting speculative
23 estimates of the amount in controversy . . . ignore[s] the strong
24 presumption against removal jurisdiction." Roth, 799 F.Supp. 2d at
25 1129 (internal quotations and citations omitted).

26    This is consistent with Ninth Circuit's rejection of
27 "Defendant's speculation and conjecture" as the basis of diversity
28

jurisdiction.[1] <u>Lowdermilk v. U.S. Bank Nat'l Ass'n</u>, 479 F.3d 994, 1002 (9th Cir. 2007). <u>See</u> <u>Roth</u>, 799 F. Supp. 2d at 1127 ("damage calculations based on variables not clearly suggested by the complaint or supported by evidence, concluding that the calculations are mere conjecture."); <u>Dupre v. Gen. Motors</u>, No. CV-10-00955, 2010 WL 3447082, at *3-4 (C.D. Cal. Aug. 27, 2010) (when a defendant assumes a 100% violation rate without presenting evidence, "equally valid assumptions could be made that result in penalty pay amounts . . . that are less than $5 million.").

To determine whether the assumption of a 100% violation rate is overly speculative here, the court will consider TECT's calculations for each cause of action.[2]

1.   <u>Cause of Action No. 2 - Meal Period Claim</u>

Under California Labor Code, an employer must provide an employee who has worked for five hours with a thirty minute meal period. If the employer fails to do so, the employee shall be paid one additional hour at her regular rate for each day the meal period was not provided. Cal. Labor Code §§ 512, 226.7. For this cause of action, Kinsley determined that the putative class members combined to work 85,463 shifts of more than five hours in the applicable four-year period. She then calculated the average rate of pay per hour for the putative class members to be between $21.30 and $24.15, depending on the year. By multiplying the average rate

---

[1] Although <u>Lowdermilk</u> was applying a "legal certainty" standard, the court deems this principle equally applicable to a "preponderance of the evidence" standard.

[2] The court will not discuss causes of action 1 (overtime claim), 6 (employee-expenses claim), and 7 (unfair-competition claim) because TECT did not calculate an amount of damages for these claims.

1  of pay by 85,463, the highest possible number of meal period
2  violations, Kinsley calculated a total amount in controversy of
3  $1,960,860.55 for this cause of action. (Kinsley Decl. ¶¶ 5-9;
4  Opp'n at 7:3-19.)

5       TECT points out that Plaintiff in his FAC alleges that
6  "Plaintiff and Class Members were not provided with meal periods
7  and were not relieved of all duties during any meal periods
8  Plaintiff and Class Members did take." (FAC ¶ 44.) TECT argues that
9  this statement amounts to an allegation of a 100% violation rate.
10  (Opp'n at 6:17-20.)  However, this assumption is not borne out by
11  the rest of the FAC.  Plaintiff further alleges, less
12  categorically, that "Plaintiff and Class Members are entitled to
13  recover one hour of premium pay for each day in which a meal period
14  was not provided." (FAC ¶ 46.)  Additionally, the prayer for relief
15  calls for pay where meal periods were not provided, but it does not
16  specify that no meal periods were provided. (FAC 24:2-3.)

17       At this early stage of the litigation and in the face of
18  allegations that are ambiguous with respect to the violation rate,
19  TECT has not offered proof to support the assertion of a 100%
20  violation rate. Thus the calculation for this cause of action is
21  overly speculative.

22            2.   <u>Cause of Action No. 3 – Rest Period Claim</u>

23       Under California Labor Code § 226.7, an employee shall be
24  compensated one hour of pay for each work day that a rest period
25  was not provided.[3]  Kinsley uses essentially the same calculation

26  ────────────────────────

27       [3] The court notes that if an employee misses both a meal
    period and a rest period in the same day, she is entitled to two
28  extra hours of pay for that day.  <u>Marlo v. United Parcel Service,</u>
                                                        (continued...)

7

1  method as above to calculate the amount in controversy. She

2  multiplied 86,427, the highest possible number of rest period

3  violations, by the average rate of pay to reach a total of

4  $1,982,840.79. (Kinsley Decl. ¶¶ 10-14.)

5       Arguing that a 100% violation rate is justified, TECT points

6  to Plaintiff's FAC which states that Defendants violated "Plaintiff

7  and Class [Members' rights] to take ten-minute rest periods for

8  every four hours worked." (FAC ¶ 48.) However, in the prayer for

9  relief, Plaintiff states that he seeks "one hour of premium pay for

10 each day in which a required rest break was not provided." (FAC at

11 24:14-15.) The court disagrees with TECT's suggestion that this

12 amounts to pleading a 100% violation rate.  The relief requested is

13 framed more narrowly.  Thus, like the meal period claim, this

14 figure is highly speculative.

15            3.  Cause of Action No. 4 - Waiting Time Claim

16      Under Cal. Labor Code § 203, an employer is liable for

17 waiting-time penalties in the form of continued compensation for up

18 to thirty days.  Kinsley used 14 putative members of the Waiting

19 Time Subclass to calculate the damages, multiplying their average

20 daily wage rate by thirty days, the maximum compensation period.

21 (Id. ¶ 18.)

22      Plaintiff's FAC alleges that TECT failed, and continues to

23 fail, to pay compensation after the putative class members left

24

25       ³(...continued)
26 Inc., 2009 WL 1258491, *7 (C.D. Cal. May 5, 2009).  See also
   Division of Labor Standards and Enforcement Manual § 45.2.8
27 (2008)("No matter how many meal periods (rest period penalties are
   separate) are missed, only one meal period premium is imposed each
28 day.").

1  TECT. (FAC ¶ 53.) Because Plaintiff alleges TECT has still not paid

2  compensation, the maximum thirty day compensation period seems

3  justified when calculating the amount in controversy. Further,

4  Plaintiff does not dispute the damages calculation for this cause

5  of action. Thus, TECT's calculation of $63,012.00 for this cause of

6  action is not speculative.

7           4.   Cause of Action No. 5 – Wage Statement Claim

8      If an employer knowingly and intentionally fails to provide a

9  complete and accurate wage statement, an employee is entitled to

10 "fifty dollars ($50) for the initial pay period in which a

11 violation occurs and one hundred dollars ($100) per employee for

12 each violation in a subsequent pay period." Cal. Labor Code §§

13 226(e). The total amount is not to exceed four thousand dollars.

14 Id. Plaintiff alleges that TECT failed, and continues to fail, to

15 provide Plaintiff and the Paystub Subclass Members with complete

16 and accurate wage statements. (FAC ¶ 58.) In TECT's calculation, it

17 assumed every wage statement for every employee was incomplete and

18 inaccurate. (Opp'n at 11:9-10.)

19     Kinsley determined 64 putative Paystub Subclass Members would

20 reach the maximum penalty of $4,000. (Kinsley Decl. ¶ 24.) This

21 amount in controversy equals $256,000. According to Kinsley, the

22 remaining 22 subclass members suffered violations in the amount of

23 $46,350 ($1,050 for initial violations and $45,300 for subsequent

24 violations). (Id. ¶ 25.) By TECT's calculations, the total amount

25 in controversy for this cause of action is $302,350. (Id. ¶ 19.)

26     Whether a 100% violation rate applies depends on TECT's wage

27 statement. The FAC alleges that "defendants intentionally failed,

28 and continue to fail, to furnish Plaintiff and Paystub Subclass

1  Members complete and accurate wage statements upon each payment of

2  wages." (FAC ¶ 58.) If Plaintiff is alleging that the wage

3  statements have a formal defect, i.e. the statements fail to state

4  the applicable hourly rate, then TECT can assume a 100% violation

5  rate because every wage statement would carry the same defect.

6  However, if Plaintiff is alleging that the wage statements are

7  incomplete because of inaccurate reporting of overtime or meal

8  periods, then a 100% violation rate would be speculative. Neither

9  party addresses this issue. Given the lack of sufficient

10  information and TECT's burden of proof, the court finds that a 100%

11  violation rate is too speculative.

12      5.   PAGA Claims

13      Under PAGA, an employee may bring a private civil action

14  against his employer for violations of the Labor Code. Cal. Labor

15  Code § 2699(a). The civil penalty is one hundred dollars for an

16  initial pay period violation and two hundred dollars for every

17  subsequent violation. Cal. Labor Code § 2699(f)(2).[4]

18      Under California law, courts have held that employers are not

19  subject to heightened penalties for subsequent violations unless

20  and until a court or commissioner notifies the employer that it is

21  in violation of the Labor Code. Amaral v. Cintas Corp. No. 2, 78

22  Cal. Rptr. 3d 572, 614 (Ct. App. 2008); Amalgamated Transit Union

23  Local 1309 v. Laidlaw Transit Serv., Inc., No. 05cv1199, 2009 WL

24  2448430, at *9 (S.D. Cal. Aug. 10, 2009).

25

26  ───────────────

27      [4] Seventy-five percent of the penalties recovered goes to the
    Labor and Workforce Development Agency, and the remaining 25% goes
    to the aggrieved employee. Cal. Labor Code § 2699(i); Brown v.
28  Ralphs Grocery Co., 128 Cal. Rptr. 3d 854, 862.

1    From the parties' papers, it is unclear if or when TECT was

2    put on notice that it was in violation of the Labor Code. Since

3    TECT carries the burden of proof and has provided no evidence about

4    when it was notified of any alleged violations, the court finds any

5    heightened penalties unreasonable.

6        TECT additionally argues that Plaintiff's FAC put the

7    heightened penalties for subsequent violations in controversy

8    simply by quoting the applicable PAGA statute. (Opp'n at 14:18-21;

9    Reply at 7:21-24.)  TECT, however, cannot meet its burden of

10   proving an amount in controversy by referring only to the statute;

11   it must point to evidence making it more likely than not that a

12   certain amount in controversy is met.  Here, there is not

13   sufficient evidence offered to establish heightened penalties for

14   this cause of action.

15           a.   <u>Cause of Action No. 8 - PAGA Claim for Alleged Wage</u>

16                <u>Statement Violations</u>

17       Plaintiff brings its cause of action for incomplete and/or

18   inaccurate wage statements under PAGA.  Here, Kinsley determined

19   that there were 85 putative class members who received at least one

20   wage statement for the applicable one-year period. (Kinsley Decl. ¶

21   30.) Assuming a 100% violation rate and using heightened penalties

22   for subsequent violations, she calculated damages of $889,500.[5]

23   _____

24   [5]In addition, Kinsley calculated a second figure of $5,526,900
     based on TECT waiving its statute of limitations defense. (Kinsley
25   Decl. ¶ 31.) The court rejects this calculation for two reasons.
     First, Kinsley used the heightened PAGA penalties in her
26   calculations. Second, it is unlikely that TECT would waive its
     statute of limitations defense. Although TECT cites to cases
27   holding that an affirmative defense cannot be used to reduce the
     amount in controversy, <u>Scherer v. The Equitable Life Assurance</u>
28   <u>Soc'y</u>, 347 F.3d 394, 397-98 (2d Cir. 2003), in this Circuit the
                                                     (continued...)

11

1  (<u>Id.</u>)  As stated above, only initial penalty levels will be used in
2  this case. Thus, the highest amount in controversy for this claim
3  can be $449,000, but because this rate is based on a 100% violation
4  rate, even that amount is speculative.

5          b.   <u>Cause of Action no. 9 - PAGA Claim for Alleged</u>
6             <u>Waiting Time Violations</u>

7      Kinsley determined that 15 putative subclass members were
8  terminated and eligible for PAGA penalties. (Kinsley Decl. ¶ 33.)
9  She calculated $1,500 in controversy based upon single PAGA
10 violation to each of the 15 putative Wait Time Subclass Members.
11 (Kinsley Decl. ¶¶ 32-33.) The court finds this calculation to be
12 reasonable because each member of the subclass at a minimum
13 suffered one violation.

14         c.   <u>Causes of Action No. 10, 11, 13 - PAGA Claims for</u>
15            <u>Alleged Overtime Violations, Meal Period Violations,</u>
16            <u>and Meal and Rest Period Violations</u>

17     In calculating these three causes of action, Kinsley used the
18 heightened PAGA penalties calculation, which the court has rejected
19 as too speculative. Using the heightened penalties, Kinsley
20 calculated $867,800 (cause of action ten), $883,000 (cause of
21 action eleven), and $885,400 (cause of action thirteen). Without
22 the heightened penalties, the maximum damages would be $438,100
23 (cause of action ten), $449,900 (cause of action eleven), and
24 $451,200 (cause of action thirteen).  Even these lowered amounts
25 assume a 100% violation rate and are therefore too speculative.

26  

27     [5](...continued)
   statute of limitations should be considered in determining the
   amount in controversy.  <u>See</u> <u>Riggins v. Riggins</u>, 415 F.2d 1259,
28 1261-62 (9th Cir. 1969).

1                 d.    Cause of Action No. 12 - PAGA Claim for Alleged

2                    Wage-Order Violations

3     TECT alleges that it is subject to PAGA penalties for alleged

4 Wage Order violations relating to overtime, meal periods, and rest

5 periods. It asserts that the amount of controversy, at a minimum,

6 is equal to the amount of either cause of action 10, 11, or 13.

7 (Opp'n at 19:5-13.) The revised highest amount for either of those

8 claims is $451,200. However, as mentioned above, the recalculated

9 amounts are still speculative because based on the 100% violation

10 rate.

11                 e.    Cause of Action No. 14 - PAGA Claim for Alleged

12                    Employee Expenses Violations

13     Plaintiff alleges TECT failed to provide full compensation for

14 business expenses. He brings this claim under PAGA. Here, Kinsley

15 determined there were 86 putative class members. She assumed that

16 each member suffered a minimum of one violation and thus multiplied

17 86 by the initial penalty of $100. The court agrees with her

18 calculation of $8,600 for this cause of action.

19         6.   Attorney's Fees

20     TECT correctly asserts that attorney's fees can be included in

21 the amount in controversy when authorized by the underlying

22 statute. Lowdermilk, 479 F.3d at 1000. In common fund cases,

23 district courts have the discretion to apply a percentage method or

24 a lodestar approach. Six Mexican Workers v. Ariz. Citrus Growers,

25 904 F.2d 1301, 1311 (9th Cir. 1990).[6] Under the percentage method,

26

27      [6] Common fund cases are cases where "counsel recover[s] a common fund which confers a 'substantial benefit' upon a class of beneficiaries." Fischel v. Equitable Life Assurance Soc'y, 307 F.3d

28                                  (continued...)

1   the Ninth Circuit has established a 25% benchmark. <u>Id.</u> at 1311.

2   Under the lodestar approach, "the court multiplies a reasonable

3   number of hours by a reasonable hourly rate." <u>Fischel v. Equitable</u>

4   <u>Life Assurance Soc'y</u>, 307 F.3d 997, 1006 (9th Cir. 2002).

5        The court is unable to apply a percentage method to this

6   action. As noted above, the amount in controversy that TECT puts

7   forth is highly speculative. There is no way of calculating 25% of

8   an unknown amount in controversy. The amount in controversy for

9   which TECT has met its burden of proof is only around $1.5 million

10  dollars.  Using the percentage method and the 25% benchmark, the

11  total amount in controversy would be under two million dollars,

12  still less than the jurisdictional requirement.

13       The court is also unable to apply a lodestar approach because

14  TECT has not provided any evidence to suggest what would constitute

15  a reasonable fee.

16       B.   TECT's Request for Jurisdictional Discovery

17       CAFA's legislative history "cautions that these jurisdictional

18  determinations should be made largely on the basis of readily

19  available information. Allowing substantial, burdensome discovery

20  on jurisdictional issues would be contrary to the intent" of

21  Congress in enacting CAFA. <u>Abrego Abrego v. The Dow Chemical Co.</u>,

22  443 F.3d 676, 692 (9th Cir. 2006)(internal citations omitted).

23  While district courts may grant additional jurisdictional

24  discovery, it is not required.  <u>Id.</u> at 691.

25       Here, TECT is the party with access to records indicating when

26  the putative class members worked and whether or not they were

27  _____

28      [6](...continued)
    997, 1006 (9th Cir. 2002).

provided overtime pay, meal periods, etc. Allowing for judicial
discovery would be an unnecessary delay to this action because TECT
already has the records necessary to show whether the amount in
controversy is met. The court finds that no jurisdictional
discovery is warranted.

**IV.  Conclusion**

While it is conceivable that the amount in controversy exceeds
$5,000,000, the removal statute is strictly construed against
removal jurisdiction when the court has some remaining doubt
whether the amount in controversy has been met. TECT has not met
its burden of proof. Thus, the court remands the action.

For the reasons stated above, Plaintiff's Motion to
Remand is GRANTED.  Plaintiff's Ex Parte Application for Extension
of Time to File Motion for Class Certification is vacated as moot.

IT IS SO ORDERED.


Dated: December 19, 2012

DEAN D. PREGERSON

United States District Judge

15